STATE of Oklahoma ex rel. OKLAHOMA
BAR ASSOCIATION, Complainant,

v.

Odes J. HARWOOD, Respondent.

S.C.B.D. 2313.

Supreme Court of Oklahoma.

June 6, 1972.

Rehearing Denied June 6, 1972.

Paul M. Vassar, Chandler, for complainant.

Odes J. Harwood, Oklahoma City, pro se.

McINERNEY, Justice.

Complainant, Oklahoma Bar Association, commenced disciplinary proceedings against respondent, Odes J. Harwood, at the direction of the Board of Governors of the Association. The complaint charged respondent with participation in a scheme to sell fraudulent silver contracts, with using a bogus check to obtain motel services and with failing to perform a contract for professional services after receiving a fee for the services. In an answer and general denial, respondent denied misconduct in dealing with the silver contracts, alleged that the check was a corporate rather than a personal obligation and stated that the legal action required by the professional contract was still pending.

A trial of the charges was conducted by a trial authority appointed by the Chief Justice of this Court. Subsequently, the trial authority submitted a report which included findings of fact, conclusions of law and a recommendation. Before stating the findings and conclusions of the trial authority, a summary of the evidence will be presented.

Respondent, as President and Attorney-in-Fact of The Oneida Mining Corporation and Silver "S" Mining Co., Inc., executed four instruments, each designated as a "Contract to sell Silver." For a consideration of $16,500.00, a purchaser of a silver contract was to receive 10,000 ounces of silver within 18 months from the date of the contract from the future silver production of Silver "S" and Oneida. At the election of the purchaser, he could receive $21,500.00 cash instead of 10,000 ounces of silver. The contracts stated that performance was insured by a financial guarantee bond issued by Trans-Continental Casualty Insurance Company, Limited, Nassau, N.P., Bahamas. Purchasers of these silver contracts received documents entitled "special marine insurance policies" issued by Trans-Continental. None of the purchasers of silver contracts bought them directly from respondent; the purchasers

bought the silver contracts from a trustee appointed by respondent.

In testimony at the trial, respondent admitted that there was no silver production at the time he executed the silver contracts. According to respondent, the purpose of the contracts was to raise capital to be used by Oneida and Silver "S" to begin silver producing operations. Respondent executed the contracts in blank, delivered them to a third party to sell and appointed this third party trustee of funds received with power to disburse the funds as directed by the board of directors of Silver "S" and Oneida.

At the time of trial, approximately one year after maturity date of the silver contracts, purchasers of the contracts had not been paid. Shortly after maturity of the contracts, an attorney for one of the purchasers contacted respondent in the course of efforts to collect on the contracts. Initially, respondent explained that the mine had water problems, but that the problems were not serious. Later, respondent admitted that the mining companies could not pay and indicated that the insurance company could not or would not pay.

A schedule of mines, signed by respondent as Secretary-Treasurer and Attorney-in-Fact for the listed corporations, was included in a prospectus furnished to one of the purchasers by the trustee appointed by respondent. This schedule indicated that Oneida owned a mine in Maricopa County, Arizona, with a $500,000.00 mill on site and ready for production; that Silver "S" owned a mine in Maricopa County with a $750,000.00 mill on site and in production; and that Silver "S" owned another mine near Prescott, Arizona, which had been operated for many years with a $250,000.00 mill on site from a reserve presently estimated at 1,000,000 ounces of silver. However, investigations conducted after maturity of the contracts by one of the purchasers and an attorney for another purchaser revealed that no mining was being done by either Silver "S" or Oneida, and that an address listed on the contracts was

an abandoned store building which had not been used for a number of years.

Other evidence introduced at the trial established: (1) that Oneida Mining Corporation was incorporated in Nevada in 1955 and that its charter was revoked about one year after execution of the contracts; (2) that Oneida's Arizona license was revoked several years prior to the events leading to this proceeding; (3) that The Silver "S" Mining Company, Inc., was incorporated in Arizona in 1967 and that it was not in good standing for failure to file annual reports; and (4) that Silver "S" was not incorporated in nor qualified to do business in Nevada. Also, an affidavit from the Arizona State Mine Inspector indicated that there is only one mining mill in Maricopa County and that its approximate value is $10,000.00.

More than two years before trial, respondent, as President and Attorney of Silver "S" Mining Co., Inc., signed the check involved in this case. The check, in the amount of $4,999.65, was payable to the Holiday Inn of Harlingen, Texas. Respondent delivered the check in payment of motel rooms and services for two persons employed to raise capital for mining operations. When presented for payment to the Oklahoma bank on which it was drawn, the check was returned because the drawer did not have an account in the bank. On the same day the check was returned, the manager of the Holiday Inn received instructions from respondent to send the check to a California bank for collection. Two or three weeks later, the check was returned by the California bank because there were insufficient funds to cover the check.

The manager of the Holiday Inn testified that respondent had promised several times before to send money from his company to apply against the motel bill. Since none of these promises had been kept, one of the employees was not allowed to remove his possessions from the motel until the manager verified that payment had been mailed by respondent. On two sep-

arate occasions, in response to direct questions from the manager, respondent had stated that the check was good. Based on these statements, the manager permitted removal of the employee's possessions.

About eight months before trial, respondent had entered into an employment contract to have the death of the spouse of his client judicially determined. On the day of employment, the client advanced court costs and soon thereafter paid respondent in advance for his services. For the first two months after employment, the client saw respondent frequently, but had not seen him for almost six months before trial. At the time of trial, respondent had not commenced the legal proceedings for which he had been paid.

Respondent defended principally on the ground that the silver contracts and the check were corporate obligations rather than his personal obligations. Though respondent admitted there was no silver production at the time the contracts were issued, he maintained in his testimony that he conducted an investigation sufficient to satisfy himself that the mining companies existed and that the companies owned adequate mining claims and mills to meet the obligations created by him for the corporations. Also, respondent testified that he secured an insurance company with substantial assets to guarantee payment of the silver contracts and that he conducted an investigation of this company to his satisfaction by making a trip to the Bahamas. Further, respondent pointed out that the trustee appointed by him sold the silver contracts, but did not disburse the proceeds to the corporations or for the benefit of the corporations.

One of the people that stayed at the Holiday Inn in Harlingen, Texas, testified for respondent. She testified that the Silver "S" owned the Savoy Mines near Prescott in Yapavai County, Arizona, that there was no mining being done, but that there was a mill on site which needed revamping. She also testified about a merger between Silver "S" and the Greater Denver-Phoenix Mining Co., Inc., stating that Denver-Phoenix owned a number of mining claims in Maricopa County, Arizona, with a mill on site which needed to be rebuilt. Further, this witness testified that there was litigation in the Supreme Court of Arizona between Denver-Phoenix and its lease tenant involving a substantial sum of money being paid into a trust fund awaiting a final decision in the litigation.

With this evidentiary background, the trial authority's findings of fact and conclusions of law will be summarized. The trial authority found: (1) that respondent was aware of the mining activities of the Oneida Mining Corporation, The Silver "S" Mining Company, Inc., and the Greater Denver-Phoenix Mining Co., Inc.; (2) that these mining companies were inoperative and improperly authorized, financed and controlled; and (3) that respondent knowingly participated in the use of misrepresentations to promote investment in these mining companies. The trial authority further found: (1) that respondent "signed, delivered and verified payment" on a company check in the amount of $4,999.65 which was drawn against a nonexistent bank account; (2) that respondent later directed transfer of this check to a second bank for collection; and (3) that the second bank returned the check because of insufficient funds. Also, the trial authority found that respondent failed to file a probate proceeding after receiving payment from his client. Based on these findings of fact, the trial authority concluded that respondent's actions constitute professional misconduct and that respondent is not a fit person to handle the legal affairs of others. The trial authority recommended that respondent be disbarred.

This Court will adopt the trial authority's findings of fact if they are supported by a preponderance of the evidence. Rules Creating and Controlling the Oklahoma Bar Association, Art. X, § 17(d), 5 O.S. Supp.1970, Ch. 1, App. 1. After a diligent

review of the entire record in this proceeding, we conclude that the trial authority's findings of fact are supported by a preponderance of the evidence. Thus, we must determine the discipline to be imposed. Rules, supra, § 17(e).

■ Although the majority of respondent's activities did not involve an attorney-client relationship, respondent may still be subject to disciplinary action by this Court. Acts contrary to honesty, justice or good morals constitute sufficient grounds for disciplinary action. Rules Creating and Controlling the Oklahoma Bar Association, Art. IX, § 4, 5 O.S.Supp.1970, Ch. 1, App. 1; State ex rel. Oklahoma Bar Association v. Pate, Okl., 441 P.2d 393, 397 (1967). When an attorney commits acts of this nature, his actions reflect upon the integrity of the legal profession and result in reduced confidence in and a loss of respect for members of the legal profession.

■ Respondent's acts warrant the discipline recommended by the trial authority. The record supports the basic and inherent finding of fact that respondent knowingly and intentionally participated in a scheme to defraud purchasers of investments in non-existent mining operations. At a time when there was in fact no account, respondent represented that a check for almost $5,000.00 was drawn against an account having sufficient funds. Moreover, respondent's neglect of his client after accepting a fee for services constitutes further professional misconduct. Thus, respondent has demonstrated that he no longer possesses the qualifications of honesty and integrity required of members of the bar.

Respondent is disbarred and his name ordered stricken from the roll of attorneys. The cost of the transcript and the cost of the proceedings are assessed against respondent.

All the Justices concur.

ON PETITION FOR REHEARING

DAVISON, Vice Chief Justice.

IT IS ORDERED that the petition for rehearing heretofore submitted by the Respondent herein be and the same is hereby denied.

Rehearing Denied June 16, 1972.